FILED

2026 Feb-27  PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARLESTON APARTMENTS OF MOBILE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-00799-NAD |
| | ) | |
| EDWARD K. SEXTON, JR., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the January 30, 2026 telephonic motion hearing, the court **GRANTS** the motion for summary judgment filed by Defendants Edward K. Sexton, Jr. and Gentle, Turner, & Benson, LLP (Doc. 88). The court separately will enter final judgment.

## BACKGROUND

### A.   Procedural background

On June 29, 2022,[1] Plaintiff Charleston Apartments of Mobile, LLC initiated

---

[1] "All legal service liability actions against a legal service provider must be commenced within two years after the act or omission or failure giving rise to the claim, and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is

this action by filing a complaint against Defendants.  Doc. 1.  Plaintiff Charleston alleged two claims for relief related to Defendants' representation of Charleston with respect to litigation that followed from allegedly defective plumbing and piping that caused leaks at an apartment complex:  Count 1 for legal malpractice, and Count 2 for fraud.  Doc. 1 at 3, 9–11.

According to the complaint, Defendants allegedly committed legal malpractice and fraud in their representation of Charleston as to both an "underlying action" against certain entities that worked on the construction and development of the relevant apartment complex (including the general contractor and the plumbing subcontractor), and a class action against NIBCO PEX (the manufacturer of the allegedly defective plumbing and piping products).  Doc. 1.  The parties consented to magistrate judge jurisdiction. Doc. 18; 21 U.S.C. § 636(c); Fed. R. Civ. P. 73.

With respect to the "underlying" action/case, the court already has granted summary judgment in favor of Defendants on both Count 1 for legal malpractice and Count 2 for fraud.  *See* Doc. 82.  In this regard, on July 25, 2025, Defendants filed a motion for partial summary judgment (Doc. 72), with a supporting brief (Doc. 73), and evidentiary material (Doc. 74).  *See* Doc. 75 (briefing schedule).  Then, on July 29, 2025, the parties filed a "Joint Notice Regarding Defendants' Motion For Partial

---

earlier . . . ."  Ala. Code § 6-5-574(a).

Summary Judgment," signed by counsel for both parties, in which Charleston stated that it did not contest the partial summary judgment motion, and the parties requested that the court dismiss with prejudice Charleston's "claims against Defendants related to the alleged late filing of the Complaint in the underlying case and untimely and defective filing of an Opposition to Ellison's Motion for Summary Judgment in the Underlying Case."  Doc. 77; *see also* Fed. R. Civ. P. 41(a)(1)(A)(ii) ("the plaintiff may dismiss an action without a court order by filing . . . a stipulation of dismissal signed by all parties who have appeared"); Fed. R. Civ. P. 41(a)(2) (dismissal by court order).

Following a status conference on August 26, 2025 (*see* Doc. 80; minute entry, entered: 08/26/2025), the court granted Defendants' partial summary judgment motion.  Doc. 82; *see also* Doc. 78 (order cancelling briefing schedule).  The court dismissed with prejudice Charleston's claims related to the underlying defendants and/or the underlying action/case.  Doc. 82 at 1.  The court ordered that the case would proceed "on both Count 1 for legal malpractice and Count 2 for fraud, but only with respect to the 'NIBCO class action.'"  Doc. 82 at 4.

So, for purpose of this summary judgment motion, both Charleston's Count 1 for legal malpractice and Count 2 for fraud remain, but only with respect to Defendants' representation of Charleston as to the NIBCO class action.

The court entered the scheduling order in this case on January 26, 2023.  Doc.

20.  The court then extended the case schedule at least four times.  *See* Doc. 41; Doc. 48; Doc. 58; Doc. 66.

On September 16, 2025, the court held a status conference with counsel for both parties.  Doc. 83; minute entry, entered: 09/16/2025.

In that September 16, 2025 status conference, the court communicated to counsel that there would be no more extensions, that dispositive motions would be due just before Thanksgiving 2025, that trial would be set for February 2026, and that a date to complete any remaining discovery would be left to the parties.  *See* minute entry, entered: 09/16/2025.

Then, on September 19, 2025, the court ordered that all potentially dispositive motions were due on or before November 26, 2025.  Doc. 85.

And, on September 22, 2025, the court set this case for trial on February 16, 2026, with an accompanying pretrial schedule.  Doc. 86.

After that, the court also held telephone status conferences with counsel for both parties on October 15, 2025, and November 13, 2025.  Doc. 84; minute entry, entered: 10/15/2025; Doc. 87; minute entry, entered: 11/13/2025.

On November 20, 2025, Defendants filed this summary judgment motion (Doc. 88), with a supporting brief (Doc. 89), and evidentiary material (Doc. 90).  The parties then fully briefed this motion.  *See* Doc. 92 (Charleston's notice of expert disclosure with respect to David Horsley, Esq.); Doc. 93 (Charleston's opposition);

4

Doc. 96 (Defendants' reply); *see also* Doc. 91 (briefing schedule).

As part of its response to this summary judgment motion, Charleston disclosed Attorney David Horsley as an expert (*see* Doc. 92), and attached to its opposition brief Attorney Horsley's "Damages Report" (Doc. 93-5).

Defendants then filed a motion to strike Charleston's expert disclosure and Attorney Horsley's "Damages Report" and to preclude any expert testimony from Attorney Horsley (Doc. 94), a supplement to that motion to strike and preclude (Doc. 95), as well as a motion for leave to supplement their summary judgment motion (Doc. 97).[2]

On January 16, 2026, the court entered an order cancelling the trial date and all pretrial deadlines (pending further order), and setting a telephonic motion hearing on this summary judgment motion and Defendants' related motions for January 30, 2026.  Doc. 105.

On January 30, 2026, the court then held the telephonic motion hearing with counsel for both parties.  *See* minute entry, entered: 01/30/2026.

_____

[2] *See* Doc. 94 ("Defendants' Motion To Strike Plaintiff's Expert Disclosure And Preclude Plaintiff From Offering Expert Testimony From David Horsley In Response To Defendants' Motion For Summary Judgment Or For Any Other Purpose In This Matter"); Doc. 95 ("Defendants' Supplemental Motion To Strike Plaintiff's Expert Disclosure And Preclude Plaintiff From Offering Expert Testimony From David Horsley In Response To Defendants' Motion For Summary Judgment Or For Any Other Purpose In This Matter"); Doc. 97 ("Defendants' Motion For Leave To Supplement Defendants' Motion For Summary Judgment").

**B.    Factual background**

The following record facts are undisputed:

Charleston is the owner and operator of a multi-building apartment complex located in Mobile, Alabama, that was substantially completed in 2011.  Doc. 89 at 5; Doc. 93-1 at 6.  The construction contract for the relevant apartment complex specified that Viega piping was to be used for the plumbing, but instead the plumbing subcontractor used NIBCO piping throughout the complex.  Doc. 89 at 5; Doc. 93-1 at 6.  From 2011 to 2018, the apartment complex experienced over 263 leaks associated with the NIBCO piping.  Doc. 89 at 6; Doc. 93-1 at 6.

In October 2018, Charleston hired and entered into a "Legal Representation Agreement" with Defendants to pursue claims associated with the allegedly defective NIBCO piping.  Doc. 89 at 6; Doc. 93-1 at 6; Doc. 93-2.  In that agreement, Charleston and Defendant agreed that Defendants would "represent [Charleston] in connection with [Charleston's] claims against any and all persons or entities, which may be liable for damages related in any way to the construction of [the apartment complex], or any materials used or specified to be used in the construction."  Doc. 93-2 at 4.

On December 27, 2013, approximately five years before Charleston retained Defendants in October 2018, a class action was filed against NIBCO, alleging several claims that NIBCO's plumbing and piping products were defective, causing

leaks and water damage.  Doc. 89 at 6 (citing *Cole, et al. v. NIBCO, Inc.*, No. 13 CV 7871 (D.N.J.)); *see* Doc. 93-1 at 6–7.  The parties to the class action submitted a settlement agreement to the presiding court on October 26, 2018, which was amended on April 7, 2019, and approved by the presiding court on April 11, 2019. Doc. 89 at 6–7 (citations omitted); *see* Doc. 93-1 at 6–7.

As part of that class action settlement, the deadline to submit a claim for payment for a qualifying leak was October 13, 2019 (150 days from May 16, 2019, the effective date of the settlement).  Doc. 89 at 8 (citation omitted); Doc. 93-1 at 7.

On June 29, 2020, Kevin Hodges, Vice President of Operations for Heritage Properties, Inc., which manages Charleston, emailed Defendant Sexton, stating that there were "numerous lawsuits and a class action against NIBCO PEX."  Doc. 1 at 5; Doc. 89 at 8–9.

On the same day (June 29, 2020), Sexton responded by email to Hodges, advising him that the plumber would have received notice of the class action, that the class action was the primary case that was settled, that the class action settlement provided nominal benefits, that other claims against NIBCO that were pending lawsuits were cases specifically excluded in the settlement documents, and that any other later filed actions would likely be barred.  Doc. 89 at 9; Doc. 1 at 34; Doc. 93-1 at 7; Doc. 93-4 at 2.  In that email, Sexton also advised that Charleston could go forward with claims against the plumber, that Charleston—"as the owner of the

property"—would not have a "direct action" against NIBCO, but that the plumber may have a claim against NIBCO. Doc. 89 at 9; Doc. 1 at 34; Doc. 93-1 at 7; Doc. 93-4 at 2.

On July 24, 2020, Sexton emailed Hodges, stating, "As we discussed, the class settlement was a sham and provided nominal benefits with claims paid pro rata – there was only 35 mill[ion dollars] give or take available for distribution. It covered all properties in the nation with Nibco over an 8 year period. I would guess hundreds of thousands. The settlement also only included one of the fittings and may have covered most of the actual tubing manufactured." Doc. 93-4 at 3 (cleaned up); Doc. 89 at 9; Doc. 93-1 at 7. In that email, Sexton also stated, "Disturbing things about the case – Charleston and similar end users did not receive notice of the settlement – and even if it had – the benefits were wholly deficient – the court that oversaw the settlement appeared to be adverse to claimants or people complain[ing] about the terms." Doc. 93-4 at 3 (cleaned up); Doc. 89 at 9.

Instead of pursuing any claim in the class action, Defendants filed a lawsuit on behalf of Charleston against the contractors which were responsible for the installation of the NIBCO piping in the relevant apartment complex—i.e., the "underlying" action/case. Doc. 93-1 at 7; Doc. 89 at 11; Doc. 1 at 7–8.

Since Charleston initiated this action for legal malpractice and fraud, Charleston has submitted claims, with accompanying documentation, for review and

resolution as part of the NIBCO class action settlement. Doc. 89 at 9–10; Doc. 93-1 at 7. Two of Charleston's claims were returned for insufficient documentation, and other claims still are pending. Doc. 89 at 10–11; Doc. 93-1 at 7–8.

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[3] And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond mere allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

---

[3] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in the nonmovant's favor. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

Even construing the evidence and all reasonable inferences in Charleston's favor, as the court must at this stage (*see Centurion Air Cargo*, 420 F.3d at 1149), there is no genuine dispute of material fact for trial.

**I.    There is no genuine dispute of material fact for trial on Charleston's fraud claim because, as a matter of law and fact, Charleston cannot maintain a cause of action for fraud against Defendants.**

There can be no fact issue for trial on Charleston's fraud claim (Count 2) because, as a matter of law and fact, Charleston cannot maintain a cause of action for fraud against Defendants, Charleston's legal service providers. *See* Doc. 1 at 10–11. In Count 2 for fraud, with respect to the NIBCO class action (*see supra* Procedural background), Charleston alleges that "the defendants misrepresented that they were actively pursuing . . . the claims against . . . NIBCO." Doc. 1 at 10–11. Charleston also alleges that it "justifiably relied on the defendants' statements . . . by not filing a claim in the NIBCO class action settlement." Doc. 1 at 11. Charleston alleges further that on June 29, 2020, Charleston "first learned that the [defendants]

had not pursued a claim in the NIBCO class action." Doc. 1 at 11; *see* Doc. 1 at 6 ("June 29, 2020, is the first time the plaintiff learned that a lawsuit had not been filed.").

On the plain language of the controlling state statute, the Alabama Legal Services Liability Act (ALSLA), Ala. Code § 6-5-570 et seq., "There shall be only one form and cause of action against legal service providers in courts in the State of Alabama and it shall be known as the legal service liability action and shall have the meaning as defined herein." Ala. Code § 6-5-573.

The ALSLA then defines a "legal service liability action" as "[a]ny action against a legal service provider in which it is alleged that some injury or damage was caused in whole or in part by the legal service provider's violation of the standard of care applicable to a legal service provider. A legal service liability action embraces all claims for injuries or damages or wrongful death whether in contract or in tort and whether based on an intentional or unintentional act or omission. A legal services liability action embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory, available to a litigant in a court in the State of Alabama now or in the future." Ala. Code § 6-5-572(1).

In this regard, the Alabama Supreme Court "has construed the ALSLA to prevent a client from bringing any action against an attorney for conduct related to

the provision of legal services under any theory of recovery outside the ALSLA." *Roberson v. Balch & Bingham, LLP*, 358 So. 3d 1118, 1129 (Ala. 2022).

Importantly, the Alabama Supreme Court "has held that the ALSLA applies to a legal malpractice action based upon fraud." *Cockrell v. Pruitt*, 214 So. 3d 324, 334 (Ala. 2016) (citing cases; quotation marks omitted); *accord In re Verilink Corp.*, 410 B.R. 697, 703 (N.D. Ala. 2009) ("All actions against 'legal service providers' are covered under the ALSLA. This includes actions based on fraud." (citation omitted)).

Here (as a legal matter), because Charleston's fraud claim is a "cause of action against legal service providers [i.e., Defendants]," *see* Ala. Code § 6-5-573, for "conduct related to the provision of legal services," *see Roberson*, 358 So. 3d at 1129, Charleston's fraud claim necessarily is a "legal service liability action" that is subsumed within the ALSLA, *see* Ala. Code § 6-5-572(1). Thus, Charleston cannot maintain any fraud claim "outside the ALSLA." *Roberson*, 358 So. 3d at 1129.

In opposition to this summary judgment motion, Charleston argues—based on the Alabama Supreme Court's decision in *Cockrell*, *see supra*—that its fraud claim falls within an "important exception [to the ALSLA] for fraudulent concealment of malpractice." Doc. 93-1 at 12–16; *see* Doc. 93-1 at 14 ("[Charleston's] fraud claim falls squarely within the fraudulent concealment exception recognized in *Cockrell*.").

Charleston's opposition brief recognizes that the "Alabama Supreme Court has consistently held that ALSLA embraces any form of action in which a litigant may seek legal redress for a wrong or an injury and every legal theory of recovery, whether common law or statutory," and that "[t]his includes claims alleging fraud." Doc. 93-1 at 12 (citations and quotation marks omitted).

Charleston is correct that, in *Cockrell*, the Alabama Supreme Court reasoned that "[n]othing in the plain language of the ALSLA specifically precludes a claim based on an attorney's fraudulent actions made for the purpose of concealing the fact that the plaintiff had a legal-malpractice claim against that attorney" (*Cockrell*, 214 So. 3d at 334). *See* Doc. 93-1 at 12.

But, as Charleston's opposition brief also recognizes (*see* Doc. 93-1 at 13), the Alabama Supreme Court concluded that any such fraudulent concealment claim "would obviously fit within the definition of a legal-service-liability action" under the ALSLA: "Fraudulent misrepresentations by an attorney for the purpose of concealing the attorney's malpractice that could likely result in a legal-malpractice claim against the attorney would obviously fit within the definition of a legal-service-liability action set forth in § 6-5-572(1), Ala. Code 1975." *Cockrell*, 214 So. 3d at 334; *id.* at 338 ("A fraud committed by an attorney that defrauds the attorney's client as to the status of the client's underlying claim is actionable under the ALSLA.").

*Cockrell* does not allow a plaintiff—like Charleston here—to maintain a freestanding common-law tort claim for fraud "outside the ALSLA." *See Roberson*, 358 So. 3d at 1129. Rather, *Cockrell* allows for a fraud claim as a subspecies of a "legal service liability action" *under the ALSLA*. *See Cockrell*, 214 So. 3d at 337 ("[The plaintiff] could bring separate tort claims *under the ALSLA* based solely on [the attorney's] fraudulent concealment of her malpractice claims against him." (emphasis added)); *id.* at 338 ("[T]he question before us is limited to whether a fraud committed by an attorney who defrauds a client as to the status of the client's underlying claim is actionable *under the ALSLA* separate and apart from the attorney's failure to timely file a complaint on the underlying claim." (emphasis added)).[4]

Tellingly, in *Cockrell*, the plaintiff "agreed" in the trial court that "all of her claims *were subsumed within the ALSLA*." 214 So. 3d at 330 (emphasis added).

---

[4] *See also Cockrell*, 214 So. 3d at 334 ("[T]he specific issue presented in this case [is] whether the ALSLA allows a plaintiff to assert a fraud claim that is based on misrepresentations an attorney has made solely for purposes of concealing a potential legal-malpractice cause of action against him or her and that is separate and distinct from claims based on the underlying legal malpractice."); *id.* at 338 ("To succeed on [the plaintiff's] legal-malpractice claims based on [the attorney's] fraudulent actions . . . ."); *id.* at 337 ("those misrepresentations during the course of [the attorney's] representation of [the plaintiff] would constitute claims of legal malpractice that are governed by the ALSLA"); *id.* (the "complaint [must] adequately allege[] a legal-malpractice claim based on the separate alleged acts of fraud").

So, as a matter of controlling Alabama state statutory and decisional law, Charleston cannot maintain an independent cause of action for fraud against Defendants outside of the ALSLA. *See, e.g.*, *Guyton v. Hunt*, 61 So. 3d 1085, 1088 (Ala. Civ. App. 2010) ("Accordingly, [the plaintiff's] fraud claim was subsumed by the legal-malpractice claim. Therefore, to the extent that [the plaintiff] argues that the summary judgment was improper as to the fraud claim, his argument is without merit.").

Moreover (as a pleading matter), *Cockrell* recognizes that the elements of a "legal-malpractice claim[] based on [an attorney's] fraudulent actions" under the ALSLA are different for fraud than they are for fraudulent suppression. *See* 214 So. 3d at 338. But Charleston's complaint alleges only a claim for "fraud," and does not appear to allege a claim for fraudulent suppression at all. Doc. 1 at 10–11; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests" (cleaned up)).

For a fraud claim, Federal Rule of Civil Procedure 9(b) requires that, "[i]n alleging fraud," the plaintiff "must state with particularity the circumstances constituting fraud." *Id.* But the complaint does not identify with particularity any allegedly fraudulent misrepresentation. *See Cockrell*, 214 So. 3d at 338 (stating that, as one of the elements of a fraud claim under the ALSLA, "[t]here must be a false

representation" (citation and quotation marks omitted)).   With respect to Defendants' representation of Charleston as to the NIBCO class action—the only theory of liability that remains on this summary judgment motion, *see supra* Procedural background—the complaint alleges only the following:   "Sexton misrepresented that the plaintiff would not have had a direct cause of action against NIBCO, and such a claim would have had to be brought to the plumber" (Doc. 1 at 7); "the defendants misrepresented that they were actively pursuing . . . the claim[] against" NIBCO (Doc. 1 at 10–11); "[t]he plaintiff justifiably relied on the defendants' statements . . . by not filing a claim in the NIBCO class action settlement" (Doc. 1 at 11); "the plaintiff . . . learned that the plaintiffs had not pursued a claim in the NIBCO class action" (Doc. 1 at 11); and, "[b]ut for the defendants' fraudulent misrepresentations that the plaintiff lacked standing to join in the class against NIBCO, the defendants did not file a timely claim in the class action lawsuit" (Doc. 1 at 11).   Rule 9(b) aside, none of these allegations supports the contention that Defendants sought to conceal any alleged malpractice anyway.

Furthermore (as a factual matter), there is no record evidence to support any claim of "[f]raudulent misrepresentations by an attorney for the purpose of concealing the attorney's malpractice" under *Cockrell*.  *See* 214 So. 3d at 334.

Instead, the only record evidence is that Defendants openly communicated to Charleston their intent to pursue on Charleston's behalf claims against the general

contractor and the plumbing subcontractor (that is, in the "underlying" action/case), and not any claim in the class action or any direct action against NIBCO. *See supra* Factual background. That may have been wrong strategically (or legally), but that it is exactly what Sexton said was the plan in the record emails from June 29, 2020,[5] and July 24, 2020, and it is undisputed that Defendants did exactly that on Charleston's behalf. *See* Doc. 93-4 at 2–3. Plus, as Defendants point out (Doc. 96 at 4), Charleston contends that Defendants "misrepresented the absence of a direct action against NIBCO during their representation and failed to inform the plaintiffs about the possibility of pursuing a claim in the NIBCO settlement," and that "[t]hese misrepresentations and omissions first took place before the October 13, 2019, deadline to submit a timely claim and continued into July of 2020" (Doc. 93-1 at 14). So, there is no evidence that Defendants—at any relevant time—concealed their intent not to pursue recovery through the class action settlement or any direct action against NIBCO.

Indeed, the only record evidence shows the opposite. As Defendants point out, the conduct that Charleston asserts constituted fraud is the same conduct that Charleston asserts constituted legal malpractice in Count 1 of the complaint. *See*

---

[5] The statute of limitations for a claim under the ALSLA is two years (Ala. Code § 6-5-574(a); *see supra* n.1), and Charleston initiated this action on June 29, 2022 (Doc. 1), two years after Sexton's June 29, 2020 email (Doc. 93-4 at 2).

Doc. 96 at 4 ("Plaintiff is arguing the same alleged misrepresentations, made both before and after October 13, 2019, constitute both the acts of malpractice and concealment.").

For instance, Charleston argues that "the defendants' multiple misrepresentations regarding the plaintiff's eligibility to join the class constitute *legal malpractice and fraud*." Doc. 93-1 at 8 (emphasis added). Charleston argues not just—as to fraud—that "Sexton misrepresented to the plaintiff that Charleston Apartments had no direct action against NIBCO, and the class action was a 'Sham'" (Doc. 93-1 at 7), and that "Defendants' alleged misrepresentations about the availability of a 'direct action' against NIBCO and their failure to inform about the NIBCO settlement claim process constitute[d] . . . fraudulent concealment" (Doc. 93-1 at 9), but also—as to legal malpractice—that Defendants' "failure to inform [Charleston] about a significant settlement opportunity and potential claims in the NIBCO class action" breached the standard of care (Doc. 93-1 at 16), and that "[t]he alleged malpractice in this case [was Defendants'] failing to inform the plaintiff about the NIBCO class action settlement and misrepresenting the absence of a direct action against NIBCO while calling the settlement a 'sham'" (Doc. 93-1 at 17–18). *See also* Doc. 93-1 at 14, 15, 20 (similar). There is no allegation or evidence of any fraud that "is separate and distinct from [Charleston's] claim[] based on the underlying legal malpractice." *See Cockrell*, 214 So. 3d at 334.

Thus, Defendants are entitled to judgment as a matter of law on the fraud claim (Count 2).  *See* Doc. 1 at 10–11.

## II.    There is no genuine dispute of material fact for trial on Charleston's legal malpractice claim because there is no expert testimony on the applicable standard of care or any alleged breach.

There can be no fact issue for trial on Charleston's legal malpractice claim (Count 1), because there is no expert testimony on the applicable standard of care or any alleged breach of that standard of care.  *See* Doc. 1 at 9–10.[6]  In Count 1 for legal malpractice, with respect to the NIBCO class action (*see supra* Procedural background), Charleston alleges that Defendants' "representation fell below the applicable standard of care of a similarly situated legal services provider by failing to research, prepare and join in the class action claim against NIBCO."  Doc. 1 at 10.

Again, on the plain language of the controlling state statute, the ALSLA, "In any action for injury or damages or wrongful death, whether in contract or in tort, against a legal service provider, the plaintiff shall have the burden of proving that the legal service provider breached the applicable standard of care. . . .  The applicable standard of care against the defendant legal service provider shall be such reasonable care and skill and diligence as other similarly situated legal service

---

[6] The court does not reach Defendants' many other arguments for summary judgment on the legal malpractice claim.  *See, e.g.*, Doc. 89 at 14–16; Doc. 96 at 9–14; Doc. 94; Doc. 95; Doc. 97.

providers in the same general line of practice in the same general area ordinarily have and exercise in a like case." Ala. Code § 6-5-580(1).

Importantly, the Alabama Supreme Court has instructed that, "even though . . . the ALSLA [does not include] an express requirement that a plaintiff offer expert testimony in support of his or her claim, generally expert testimony is required." *Wachovia Bank, N.A. v. Jones, Morrison & Womack, P.C.*, 42 So. 3d 667, 680 (Ala. 2009).

While Charleston recognizes that "expert testimony is generally required to establish the standard of care in legal malpractice cases," Charleston argues that its legal malpractice claim falls within the "common knowledge" exception to this requirement. Doc. 93-1 at 16–17; *see Valentine v. Watters*, 896 So. 2d 385, 394 (Ala. 2004) ("[A]n exception to the general requirement that a plaintiff present expert testimony in support of a legal-malpractice claim occurs where a legal-service provider's want of skill or lack of care is so apparent as to be understood by a layperson and requires only common knowledge and experience to understand it.").

"[W]hen determining whether expert testimony is necessary, a trial court should ask whether the attorney's actions 'involved the exercise of professional judgment.'" *San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 897 F. Supp. 2d 1122, 1197 (N.D. Ala. 2012) (quoting *Wachovia Bank*, 42 So. 3d at 684).

Charleston argues that the "duty to disclose material facts is not a complex

legal concept requiring specialized knowledge to understand," and that the "alleged malpractice in this case—failing to inform the plaintiff about the NIBCO class action settlement and misrepresenting the absence of a direct action against NIBCO while calling the settlement a 'sham'—falls squarely within the common knowledge exception." Doc. 93-1 at 17–18.

But the only record evidence is that the decision to pursue the "underlying" action/case against the general contractor and the plumbing subcontractor, rather than to file any claim in the class action settlement or pursue a direct action against NIBCO, was strategic and "involved the exercise of professional judgment." *See San Francisco Residence Club*, 897 F. Supp. 2d at 1197; *Wachovia Bank*, 42 So. 3d at 684.

In an email to Hodges on June 29, 2020 (as noted above, *see supra* Factual background), Sexton stated, "[W]e can go forward with claims against the plumber. From my reading of the class settlement . . . the plumber may have a claim against NIBCO and may try to add them in as a 3rd party defendant – basically saying if the plumber is liable then NIBCO is liable to him." Doc. 93-4 at 2 (cleaned up).[7]

---

[7] With respect to the "underlying" action/case, Sexton also stated in the email that "[t]he plumber could argue that the defects were known prior to the time when we actually inspected it and shouldn't be allowed – but it's my understanding that he had made repairs and never disclosed that he did not use the plumbing pex specified in the contract – basically covering up his breach – that fraud would likely obviate any claim the plumber may make if he contends that you should have known of his fraud and breach earlier. I'm not sure what coverage the plumber had – but the

In addition, in an email to Hodges on July 24, 2020, Sexton explained his reasoning for not pursuing a claim against NIBCO as part of the class action settlement: "As we discussed the class settlement was a sham and provided nominal benefits with claims paid pro rata – there was only 35 mill[ion] dollars give or take available for distribution. It covered all properties in the nation with Nibco over an 8 year period. I would guess hundreds of thousands. The settlement also only included one of the fittings and may have covered most of the actual tubing manufactured. Disturbing things about the case – Charleston and similar end users did not receive notice of the settlement – and even if it had – the benefits were wholly deficient – the court that oversaw the settlement appeared to be adverse to claimants or people complain[ing] about the terms." Doc. 93-4 at 3.

Sexton also explained his reasoning for not pursuing a direct action against NIBCO in the June 29, 2020 email to Hodges: "Kevin – as we discussed – the plumber would have received the class action settlement notice – this is the primary case that was settled and provided nominal benefits – The other claims against NIBCO that are pending lawsuits were cases specifically excluded in the settlement documents – I did a search and could not find any other class actions that would deal

---

contract I think required him to have 2 million in coverage – please let me know if you need anything else or if the owners want to talk to me – I'll be glad to answer any questions they have." Doc. 93-4 at 2 (cleaned up).

with the claims settled in the one mentioned above – and if there were any other later filed actions they would likely be barred. . . . From my reading of the class settlement . . . your company as the owner of the property wouldn't have a direct action against NIBCO." Doc. 93-4 at 2 (cleaned up).

Again, Defendants' decision to pursue on Charleston's behalf claims against the general contractor and the plumbing subcontractor (that is, in the "underlying" action/case), and not any claim in the class action or any direct action against NIBCO may have been wrong strategically (or legally), but the only record evidence is that the decision "involved the exercise of professional judgment." *See San Francisco Residence Club*, 897 F. Supp. 2d at 1197; *Wachovia Bank*, 42 So. 3d at 684.

Accordingly, the questions of what was the applicable standard of care and whether Defendants' strategic decisions breached that standard of care are beyond the ken or "common knowledge and experience" of the average juror and require supporting expert testimony. *See* Ala. Code § 6-5-580(1); *Valentine*, 896 So. 2d at 394.

Next, Charleston argues that, even if expert testimony is required, Attorney Horsley's "Damages Report"—which Defendants have moved to strike, *see* Doc. 94; Doc. 95—is sufficient to create a fact issue for trial. *See also* Doc. 92 (notice of expert disclosure).

However, Attorney Horsley's "Damages Report" does not address any

standard of care or breach of the standard of care, and instead "quantifies the economic losses suffered by Charleston Apartments." Doc. 93-5 at 2. Attorney Horsley's "Damages Report" does include the conclusory assertions that these alleged economic losses were "directly traceable to defendants' malpractice and fraud," and "due to defendants' malpractice and fraudulent misrepresentations in failing to assert and prosecute claims available under the national NIBCO Settlement Agreement" (though apparently not any direct action against NIBCO). *See* Doc. 93-5 at 2, 5. But, without more, any such barebones conclusions cannot create a fact issue for trial on what was the applicable standard of care and whether Defendants' strategic decisions breached that standard of care. *See, e.g.*, *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("An affidavit cannot be conclusory.").

While Attorney Horsley's "Damages Report" also asserts that "Defendants told Charleston Apartments the claim was being prosecuted [as part of the NIBCO class action settlement] when it was not," and that Defendants "[m]isrepresented the litigation status to Charleston Apartments" (Doc. 93-4 at 2, 4), Defendants point out that the only record evidence is to the contrary: "There is no evidence in this case that Defendants ever told Plaintiff that Defendants were pursuing a claim on behalf of Plaintiff with the Settlement Administrator. In fact, Plaintiff 's evidence is the opposite. Plaintiff contends Defendants told Plaintiff not to pursue a claim with the NIBCO Class Action Settlement Administrator because the settlement was 'a

sham.'"  Doc. 96 at 5 n.1; *see* Doc. 93-4 at 3 (Sexton's July 24, 2020 email to Hodges); *supra* Part I.  Regardless (again), without more, such bare, unsupported fact assertions cannot create a fact issue for trial on what was the applicable standard of care and whether Defendants' strategic decisions breached that standard of care. *See* Ala. Code § 6-5-580(1).

Thus, Defendants are entitled to judgment as a matter of law on the legal malpractice claim (Count 1).  *See* Doc. 1 at 9–10.

## CONCLUSION

For the reasons stated above, Defendants' summary judgment motion (Doc. 88) is **GRANTED**.  Charleston's claims are **DISMISSED WITH PREJUDICE**.

Separately, the court will enter final judgment.

**DONE** and **ORDERED** this February 27, 2026.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE